CHARLES E. CANTER (Cal. Bar No. 263197)
Email:  canterc@sec.gov
DAVID S. BROWN (Cal. Bar No. 134569)
Email: browndav@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katharine E. Zoladz, Associate Regional Director
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> JAMES ARTHUR MCDONALD, JR. and HERCULES INVESTMENTS, LLC, <br><br> Defendants. | Case No.  2:22-cv-6799 <br><br> **COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a), and Sections 209(d), 209(e)(1), 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 80b-14.

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant Hercules Investments LLC ("Hercules") has its principal place of business in this district.

## SUMMARY

4.      This securities enforcement action involves two related fraudulent schemes committed by Defendant James Arthur McDonald, Jr. ("McDonald").  All told, McDonald fraudulently raised approximately $5.1 million from about 23 investors and clients, misappropriating more than $1.5 million in investor money to fund his lavish lifestyle and making at least $1.4 million in Ponzi-like payments to investors.

5.      First, between May 2019 and October 2021, McDonald, through his control of Index Strategy Advisors, Inc. ("ISA")—an unregistered investment

1

adviser—solicited over $3.6 million from approximately 20 investors for ISA's index hedge fund, the ISA Fund.

6.     McDonald told investors that the ISA Fund profitably traded securities, but McDonald used less than half that amount for trading purposes, with long stretches of time where he did not trade at all.  McDonald sent ISA Fund investors false account statements showing positive returns from trading and cash held at the end of each month.  In addition, McDonald commingled investor funds with funds from his personal bank account, which had itself had been commingled with ISA funds and those of an SEC-registered investment adviser McDonald also controlled, Hercules.  Using the commingled funds, McDonald made Ponzi-like payments to ISA Fund investors and payments to clients of Hercules.  McDonald also used $1 million of ISA Fund investor monies to fund his extravagant lifestyle, including purchasing luxury vehicles, paying rent on his luxury home, and hundreds of thousands of dollars on personal credit card charges, as well as to pay expenses associated with operating Hercules.

7.     Second, between February and October 2021, McDonald offered and sold equity investments in Hercules itself, raising $1.5 million from two types of investors: one non-client group and two existing individual Hercules clients. McDonald falsely represented to the non-client investor group that its funds would be used to expand Hercules's business, but he lied about the firm's financial condition and failed to disclose that he had promised Hercules clients that the firm would repay earlier losses they had incurred as a result of bad trades McDonald had made in the fall of 2020.  McDonald also lied to the Hercules client investors telling them that their funds would be spent on Hercules business operations or be used to engage in securities trading.  In fact, McDonald commingled their funds with his personal assets, and used the money to make payments to clients and investors and pay personal expenses, including purchasing a Porsche.  In furtherance of his scheme, McDonald also induced existing Hercules clients to make, on Hercules's behalf,

payments of nearly $1.1 million directly to other clients as partial repayment for their trading losses in exchange for an equity stake in Hercules.

8.    Through their conduct, and as further detailed below, Defendants violated the antifraud provisions of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 206 of the Advisers Act and Rule 206(4)-8 thereunder.

9.    The SEC seeks findings that Defendants committed these violations; permanent injunctions against each Defendant's future violations of the securities laws; disgorgement with prejudgment interest from Defendants; and civil monetary penalties against Defendants.

## **DEFENDANTS**

10.    **McDonald** was a resident of Arcadia, California at the time of the conduct at issue here.  He was the sole owner and control person of ISA and served as the investment adviser to ISA's index option hedge fund, the ISA Fund.  He was the sole owner and control person of Hercules, and the portfolio manager of the Hercules Fund.  He was a registered with the SEC as an investment adviser representative with Edward Jones from October 2001 to February 2002, with Compass Brokerage, Inc. from December 2003 to April 2006, and with Kershner Trading Group, LLC in October 2008.  Until December 31, 2021, McDonald was an investment adviser representative of Hercules.

11.    **Hercules** is a California limited liability company that was based in Los Angeles, California, incorporated on June 8, 2019.  McDonald was its managing member, CEO, chief investment officer, chief compliance officer, and majority owner.  Hercules served as the investment adviser to the Hercules Fund.  Hercules was registered as an investment adviser in California that was terminated effective April 11, 2021.  Hercules's registration as an SEC-registered investment adviser became effective December 1, 2020.  Hercules is currently registered with the SEC as an investment adviser.

## RELATED ENTITIES

12.     **ISA** was a Texas corporation, based in Richmond, Texas, and Los Angeles, California, incorporated on March 8, 2010.  Its right to transact business in Texas was forfeited on September 22, 2017 and it ceased as a legal entity when its corporate charter was forfeited by Texas state authorities on January 26, 2018.  Between 2010 and 2019, ISA was registered as an investment adviser in Arizona, California, Florida, Georgia, Ohio, Texas, and Virginia.  ISA filed a Form ADV-W effective May 1, 2019, which was a full withdrawal.  ISA operated the ISA Fund, a pooled investment vehicle within the meaning of Rule 206(4)-8(b), 17 C.F.R. 275.206(4)-8(b).  The ISA Fund was not incorporated as an entity.  Neither ISA nor the ISA Fund were registered with the SEC in any capacity.

13.     The **Hercules Fund** (ticker: NFLHX) was a mutual fund and a series of the SFS Series Trust, an open-end management investment company organized as a Delaware statutory trust on July 14, 2020, which is registered with the SEC under the Investment Company Act of 1940.  Hercules Investments, LLC served as the investment adviser to the Hercules Fund.  The Hercules Fund registration statement became effective on December 15, 2020.  It commenced trading on January 29, 2021.  On September 9, 2021, the fund administrator filed a prospectus supplement indicating that the Hercules Fund would be liquidated on or about September 15, 2021.

## THE ALLEGATIONS

### A.     The ISA Fraud

14.     From May 2019 through October 2021 ("the ISA Fraud Period"), McDonald solicited investors for the ISA Fund through ISA's website.

15.     McDonald also solicited investors from previous clients of ISA, referrals from existing ISA Fund investors and Hercules employees, and by word of mouth from his television appearances as a business news commentator on CNBC and other business news channels.

4

16.    McDonald provided ISA Fund investors with a brochure and performance fee investment advisory contract.  The contract also represented that ISA charged a 2% annual fee plus a 20% performance fee applied to profits.

17.    ISA's state investment adviser registrations were terminated in 2019.

18.    McDonald continued to use the ISA name not only after the state registrations were terminated, but also after ISA was rendered defunct by the Texas forfeiture of its charter.

19.    In addition, McDonald continued to provide to ISA Fund investors a brochure and investment advisory contract, which falsely represented that ISA was a registered investment adviser and that McDonald and ISA managed client accounts.

20.    The ISA Fund investments offered and sold by ISA and McDonald are securities because they were investment contracts.

21.    Investors in the ISA Fund provided their money to McDonald, and risked the loss of those funds from the possibility that the investment would not be successful.

22.    The ISA Fund pooled funds from investors in order to make investments in the securities markets.

23.    The fortunes of ISA Fund investors were tied to McDonald's in that the ISA Fund account statements indicated that McDonald was compensated through his receipt of a "financial advisor fee" for profits generated from the ISA Fund's purported trading activity.

24.    ISA Fund investors had a reasonable expectation of profits from their investment that would have derived solely from the efforts of McDonald.

25.    Once invested in the ISA Fund, the investors were entirely passive in that they had no control over the use of their invested money, no ability to identify or contact each other (apart from pre-existing relationships independent of their investments), and no means to bring about any management changes in how the ISA Fund was run.

26.    While serving as the investment adviser to the ISA Fund, McDonald told investors the Fund would invest in the securities markets, trading options through algorithmic trading.

27.    ISA and McDonald sent ISA Fund investors false monthly account statements, which included an "ending asset allocation" that showed the investors' funds were held 100% in cash at month's end, as well as the opening and closing account balances and a "cumulative return," ostensibly from securities trading.

28.    McDonald authored the statements sent to ISA Fund investors.

29.    As one example, an individual agreed to invest $420,000 with McDonald in November 2019 after a series of emails and videoconference calls in which McDonald told the investor that McDonald had a successful track record producing returns as high as 300%.

30.    McDonald also showed the investor charts and graphs demonstrating McDonald's trading prowess using his own algorithms to profitably trade options.

31.    McDonald, in "Custom Portfolio Recommendation" dated November 7, 2019, initially represented to this individual that the individual's money would be invested in several different exchange-traded funds and high-yield corporate debt.

32.    In early February 2020, ISA sent this investor a statement showing a cash balance of over $460,000 as of January 31, 2020, and "realized" "profit" of $29,472.68, a 6.1% monthly return.

33.    In early March 2020, ISA sent another statement showing a cash balance of over $529,000 as of February 28, 2020, and "realized" "profit" of $69,693.57, a 15.8% monthly return.

34.    ISA and McDonald stopped sending statements to ISA Fund investors in August 2021.

35.    During the ISA Fraud Period, McDonald transferred approximately $1.6 million of the amount raised from ISA Fund investors, or 45% of total investor funds,

to a brokerage account held in ISA's name that McDonald controlled.  These were the only ISA investors funds McDonald used for actual options trading.

36.    During the ISA Fraud Period, trading in the ISA Fund brokerage account produced net profits of less than $130,000 in the aggregate, and for thirteen months—from August through November 2019 and from October 2020 through May 2021—there was no trading at all within the account.

37.    The ISA Fund account mostly traded options, many of which were held for periods of longer than 30 days and did not settle in cash at the end of each month, contrary to what McDonald had represented to investors in the monthly statements he sent.

38.    During the ISA Fraud Period, actual profitable trading on a monthly basis ranged from a low of $1,395 to a high $76,000, and monthly losses ranged from $56,713 to $85,222.

39.    McDonald also misrepresented to investors what assets the ISA Fund actually held.

40.    For example, in August 2019, ISA Fund account statements to investors showed a cumulative cash balance of $1,219,259, but ISA's brokerage and bank accounts held only $99,000 in cash.

41.    In August 2020, the ISA Fund account statements sent to investors showed nearly $4 million held in cash, but ISA actually held just over $215,000 in cash.

42.    In August 2021, the ISA Fund account statements sent to investors showed $2.2 million in cash, but ISA, in fact, had less than $15,000 in actual cash on hand.

43.    McDonald commingled the ISA Fund assets with money from his personal bank account and deposits from Hercules clients, a separate entity.

44.    He misused and misappropriated the commingled funds in the following approximate amounts:

(a)     $1.4 million in payments to ISA Fund investors;

(b)     $825,000 in payments to clients and/or creditors of Hercules;

(c)     $233,000 in payments to clients of ISA;

(d)     $149,000 in payments to Hercules employees; and

(e)     $1.1 million in payments for McDonald's personal expenses, including $301,000 for luxury vehicles, $197,000 in shopping charges, $163,000 on transportation-related expenses, $133,000 for rent on his residence.

45.     Because payments to ISA Fund investors exceeded the cumulative ISA Fund's profits, the payments ISA Fund investors were fraudulent, Ponzi-like payments.

46.     ISA Fund investors did not authorize McDonald or ISA to pay McDonald's personal expenses, or to make payments to Hercules, Hercules' clients, or ISA's clients.

47.     In a phone call with an ISA Fund investor on or about November 4, 2021, McDonald admitted that he used the investor's money to pay off Hercules' clients and creditors.

**B.     The Hercules Fraud**

48.      Hercules' most recent Form ADV, filed with the SEC in May 2021, identified 105 clients, 144 accounts, and $33.2 million of assets under management.

49.     Hercules and McDonald touted McDonald's purport expertise as an options trader. For example:  Hercules' website, as well as documents provided to clients, highlighted its active investment management, expertise in monetizing market volatility, and market-hedged growth strategies used to generate "all-weather performance."

50.     Hercules's advisory clients held investment assets in brokerage accounts that Hercules managed for an advisory fee.

51.     Starting in mid-2020, Hercules and McDonald promoted a trading strategy they claimed was designed to take advantage of anticipated market volatility surrounding the 2020 presidential election and the ongoing effects of the Covid-19 pandemic.

52.     In the fall of 2020, Hercules and McDonald initiated trades in client accounts consistent with that strategy, but markets did not drop as Hercules and McDonald expected.

53.     By the first week of December 2020, their strategy produced realized and unrealized losses in Hercules client accounts that ultimately grew to between $30 and $40 million, and as many as one-half of Hercules clients saw their account balances decrease by at least 50%.

54.     Starting in early December 2020, Hercules and McDonald initiated a "loss recovery" plan to compensate clients for the massive trading losses they incurred.

55.     McDonald told clients the goal of the plan was to "restore" account balances and to deter client lawsuits as well as complaints to regulators about the losses, telling them this would be accomplished through trading in client accounts and advisory fees generated from the Hercules Fund.

56.     McDonald told clients that if the trading profits and fees were insufficient, Hercules and McDonald would repay clients themselves.

57.     McDonald also gave some clients a personal guarantee agreement that represented he would pay the amount specified in the contract and, in the event Hercules defaulted, the client could enforce the guarantee against McDonald.

58.     Shortly after initiating the loss recovery plan, Hercules and McDonald sought to raise funds from investors, including existing Hercules clients, through a purported "capital raise" for Hercules and the Hercules Fund.

59.    Between February and October 2021 ("the Hercules Fraud Period"), Hercules and McDonald raised approximately $1.5 million from the offer and sale of limited liability units in Hercules.

60.    The Hercules units offered and sold by Hercules and McDonald are securities in the form of investment contracts.

61.    Investors in Hercules provided their money to McDonald, and risked the loss of those funds from the possibility that either investment would not be successful.

62.    Hercules and McDonald pooled funds from investors allegedly in order to expand Hercules' investment adviser business.

63.    McDonald represented to investors they would profit alongside Hercules given not only his expertise as an options trader, but Hercules' purported success trading on behalf of clients and its revenue projections.

64.    Hercules investors had a reasonable expectation of profits from their investment that would have derived solely from the efforts of McDonald.

65.    Once invested, the investors became part owners of Hercules with McDonald, thus linking the investors' fortunes to those of Hercules and McDonald.

66.    Once invested, the investors were entirely passive in that they had no control over the use of their invested money, no ability to identify or contact each other, and no means to bring about any management changes in how the Hercules was run.

67.    Hercules and McDonald solicited funds from prospective investors using a pitch deck, which represented that Hercules was selling up to $20 million of its equity in the form of a convertible note or equity units.

68.    Hercules and McDonald represented that investor funds would be used "to finance the expansion of the firm's infrastructure" and to hire sales staff to promote the Hercules Fund.

69.     The pitch deck contained a "use of funds" provision that represented investor funds would be used to "expand trading and administrative team[s], employee salespeople and introducers" as well as "infrastructure, software, [and] platform fees."  The pitch deck also included a "financial summary" for 2021 to 2023 with projected earnings (before depreciation, interest, and taxes) growing from over $17 million to over $165 million during that period and a "valuation" in year three of over $1 billion.

70.     Hercules and McDonald also gave prospective investors a company overview that touted Hercules' trading expertise and its successful trading on behalf of clients.

71.     Although Hercules and McDonald solicited investments from several prospective outside investors, they raised funds from only one outside investor group (family members who pooled their money into a single investment) that was not a client of the firm.

72.     In a recorded Zoom call on or about February 27, 2021, McDonald represented that the non-client investor's funds would not be used to operate Hercules but instead to grow the business.

73.     On another recorded Zoom call on or about March 3, 2021, McDonald told this investor that each unit offered for sale was currently worth $50,000, valuing Hercules at $50 million, which McDonald represented was "extremely below market."  McDonald further represented that Hercules' revenue projections would increase from between 150% and 1,000% and the investment in the firm was "going to be incrementally worth more" in the future and that the firm would soon be worth "a billion dollars."

74.     Hercules and McDonald failed to disclose to the non-client investor that (1) several Hercules clients had threatened to sue or complain to regulators over the handling of their accounts and were demanding immediate repayment of their losses; (2) Hercules and McDonald had promised to repay clients for trading losses of

between $30 million and $40 million; and (3) Hercules and McDonald were going to use the investor's funds to repay clients for their losses.

75.    McDonald gave the non-client investor a Hercules unit purchase and operating agreement valuing one unit in Hercules at $50,000.

76.    On or about March 9, 2021, the non-client investor wired Hercules $675,000 as part of a planned $1 million investment.

77.    McDonald immediately spent the money he raised from the non-client investor for both business and non-business purposes, including a March 10, 2021 payment of $174,610 for a 2021 Porsche 911 Turbo S Cabriolet.

78.    On March 12, 2021, McDonald acknowledged to the non-client investor via email that McDonald's "handling of [the investor's] funds was not professional." He further acknowledged "that more full disclosure of our need for the funds should have been given."

79.    In the same email, McDonald included a promissory note that he had drafted to repay the investor in six months.

80.    Hercules and McDonald also offered and sold units in Hercules to two existing investment advisory clients of the firm.

81.    Both of these clients had suffered losses in their brokerage accounts managed by Hercules and McDonald.

82.    Hercules and McDonald raised $850,000 from the two firm clients, representing that their funds would be spent on legitimate business expenses of the firm.

83.    One client, who previously sustained trading losses, attended a meeting McDonald conducted where he was shown the Hercules pitch deck.

84.    This client was offered a 4% interest in Hercules, or approximately 11 units, in exchange for a $570,000 investment.

85.    McDonald represented to this client investor that his equity investment in Hercules would be used on Hercules business operations.

86.     The other Hercules client, who also sustained trading losses in accounts managed by Hercules and McDonald, transferred $280,000 to Hercules in exchange for units in Hercules worth $1 million, or 10 units.

87.     McDonald represented to this client that the invested funds would be used by the firm to engage in securities trading.

88.     Hercules and McDonald also offered and sold units in Hercules to two other existing clients of the firm who agreed to make payments directly to other clients as partial repayment for those clients' trading losses.

89.     In early 2021, Hercules and McDonald falsely represented to those clients the payments to the other clients would avert any lawsuits or complaints to regulators and would enable Hercules to profitably trade and repay all client losses.

90.     These representations were false or misleading because McDonald knew or should have known such payments would not be sufficient to prevent a client from filing a lawsuit or complaint against him and Hercules.  In fact, in early January 2021, before McDonald solicited payments from his clients, he instructed his and Hercules's counsel to negotiate a settlement with at least one other client who had threatened legal action over the handling of his advisory account and who, a short time later, filed a lawsuit against Hercules and McDonald.  McDonald knew of potential lawsuits from clients as early as December 2020.

91.     The paying clients transferred a total of $1 million to the two other clients who had threatened to sue Hercules and McDonald, or complain to regulators if they were not repaid.

92.     One paying client transferred $224,000 in exchange for a 2% interest in Hercules, or 20 units, valued—by McDonald—at $1 million.

93.     The other paying client transferred $800,000 in exchange for a 5% interest in Hercules.

94.     McDonald also offered this client an additional 2% interest in Hercules as compensation for his trading losses of $252,000.

95.    During the Hercules Fraud Period, McDonald commingled at least $1.5 million of investor money with other funding sources, including $986,000 bridge financing loans made to Hercules, $685,000 transferred from a Hercules brokerage account, and $654,000 in McDonald's personal funds.

96.    McDonald misused and misappropriated the commingled funds in the following approximate amounts:

      (a)    $677,000 in payments to Hercules clients;

      (b)    $738,000 in business loan repayments;

      (c)    $106,000 in payments to Hercules' non-client investor;

      (d)    $894,000 in transfers to Hercules brokerage account;

      (e)    $645,000 in transfers to McDonald's personal account (later transferred to ISA); and

      (f)    $440,000 in payments for McDonald's personal expenses, including $174,000 to purchase a Porsche, $119,000 for rent on his home, credit card bills of $63,000, cash withdrawals of $34,000, and transportation expenses of $35,000.

## C.    Materiality

97.    The ISA Fund investors would have considered it important to know that ISA had been suspended as a corporation and was no longer a state-registered investment adviser.

98.    The ISA Fund investors would have considered it important to know that McDonald prepared false account statements that showed non-existent trading profits and funds held in cash at month's end.

99.    The ISA Fund investors would have considered it important to know that McDonald would use investor funds to pay any of the following:

      (a)    McDonald's personal expenses;

      (b)    Ponzi-like returns to ISA Fund investors;

      (c)    Hercules clients; or

1            (d)    Hercules' business expenses.

2        100.   Hercules investors would have considered it important to know that

3    Hercules had lost tens of millions of dollars for its clients, which McDonald had

4    promised to repay.

5        101.   Hercules investors would have considered it important to know that

6    McDonald would use investor funds to pay any of the following:

7            (a)    McDonald's personal expenses;

8            (b)    Hercules clients for their trading losses;

9            (c)    business loan repayments; or

10           (d)    ISA clients and ISA Fund investors.

11   **D.**    **McDonald Acted Knowingly, Recklessly or, at a Minimum,**

12   **Negligently**

13       102.   McDonald, as the sole owner of ISA and the investment adviser to the

14   ISA Fund, knew, or was reckless in not knowing, that he was not authorized to use

15   ISA Fund investor money to pay his personal expenses, Hercules clients, or Hercules'

16   business expenses.

17       103.   McDonald, as the sole owner of ISA and the investment manager of the

18   ISA Fund, knew, or was reckless in not knowing, that ISA was rendered defunct by

19   the Texas forfeiture of its charter in 2018 and ISA's state registrations as an

20   investment adviser were terminated as of May 2019.

21       104.   McDonald, as the sole owner of ISA and the investment manager of the

22   ISA Fund, knew, or was reckless in not knowing, that the ISA Fund account

23   statements sent to investors were false.

24       105.   McDonald, as the sole owner of ISA and the investment manager of the

25   ISA Fund, knew, or was reckless in not knowing, that returns paid to ISA Fund

26   investors were Ponzi-like payments using ISA Fund investor money.

27

28

106.    At a minimum, McDonald acted unreasonably in using ISA Fund investor money to pay his personal expenses, Hercules clients, or Hercules' business expenses.

107.    At a minimum, McDonald acted unreasonably in disseminating brochures and investment advisory contracts that falsely indicated that ISA was a state-registered investment adviser.

108.    At a minimum, McDonald acted unreasonably in preparing and sending false account statements to ISA Fund investors.

109.    At a minimum, McDonald acted unreasonably in making Ponzi-like payments to ISA Fund investors.

110.    McDonald, as the sole owner and control person of Hercules and the investment adviser to the Hercules Fund, knew, or was reckless in not knowing, that he was not authorized to use Hercules investor money to pay his personal expenses, Hercules clients, Hercules' business loans, or ISA clients and ISA Fund investors.

111.    McDonald, as the sole owner and control person of Hercules and the investment adviser to the Hercules Fund, knew, or was reckless in not knowing, that the Hercules clients had lost tens of millions of dollars, which McDonald had promised to repay.

112.    At a minimum, McDonald acted unreasonably in using Hercules investor funds to pay his personal expenses, Hercules clients, Hercules' business loans, or ISA clients and ISA Fund investors.

113.    At a minimum, McDonald acted unreasonably in failing to disclose the extent of the trading losses incurred by Hercules clients and McDonald's promises to repay those losses.

114.    Because McDonald controlled Hercules, his scienter and/or negligence can be imputed to Hercules.

### E.    McDonald Acted as an Investment Adviser

115.    At all relevant times, both McDonald and Hercules were investment advisers within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. §§ 80b-2(a)11), as they both, for compensation, engaged in the business of advising others, either directly or through publications and writings, as to the value of securities or as to the advisability of investing in, purchasing or selling securities.

116.    McDonald was the sole owner and manager of ISA, and he received compensation for giving advice to the ISA Fund.

## FIRST CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (Against All Defendants)

117.    The SEC realleges and incorporates by reference paragraphs 1 through 116 above.

118.    In the offer or sale of the ISA Fund securities, McDonald misled and deceived ISA Fund investors and prospective investors by (1) falsely claiming that the ISA Fund would use investor funds to profitably trade securities, (2) sending investors false account statements that McDonald created which showing positive account balances and investment returns, (3) claiming investor funds would be held in cash at month's end, and (4) using false and misleading brochures and contracts indicating that ISA was properly registered as an investment adviser when, in fact, it had been suspended as a corporation and was no longer a state-registered investment adviser.

119.    In addition, McDonald engaged in a scheme to defraud whereby he defrauded ISA Fund investors by making and/or disseminating false and misleading statements, misused investor funds by using them to pay his personal expenses, to pay Hercules clients and/or creditors, and to pay Ponzi-like returns to investors.

120.   In the offer or sale of the Hercules equity securities, McDonald and Hercules misled and deceived Hercules investors and prospective investors by (1) falsely claiming that investor funds would be used to expand the Hercules business by hiring employees, marketing, and building infrastructure, and (2) failing to disclose the weak financial condition of the Hercules business at the time of the offering and McDonald's promises to Hercules' clients to repay their losses.

121.   In addition McDonald and Hercules engaged in a scheme to defraud whereby they defrauded Hercules investors by making and/or disseminating false and misleading statements, misused investor funds by using them to pay McDonald's personal expenses, Hercules clients, a Hercules loan, and by transferring investors funds to ISA.

122.   By engaging in the conduct described above, Defendants, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

123.   Defendants, with scienter, employed devices, schemes, or artifices to defraud; and Defendants, with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and Defendants, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

124.   By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against All Defendants)**

125.   The SEC realleges and incorporates by reference paragraphs 1 through 116 above.

126.   In connection with the purchase or sale of the ISA Fund securities, McDonald misled and deceived ISA Fund investors and prospective investors by (1) falsely claiming that the ISA Fund would use investor funds to profitably trade securities, (2) sending investors false account statements that McDonald created which showing positive account balances and investment returns, (3) claiming investor funds would be held in cash at month's end, and (4) using false and misleading brochures and contracts indicating that ISA was properly registered as an investment adviser when, in fact, it had been suspended as a corporation and was no longer a state-registered investment adviser.

127.   In addition, McDonald engaged in a scheme to defraud whereby he defrauded ISA Fund investors by making and/or disseminating false and misleading statements, misused investor funds by using them to pay his personal expenses, to pay Hercules clients and/or creditors, and to pay Ponzi-like returns to investors.

128.   In the offer or sale of the Hercules equity securities, McDonald and Hercules misled and deceived Hercules investors and prospective investors by (1) falsely claiming that investor funds would be used to expand the Hercules business by hiring employees, marketing, and building infrastructure, and (2) failing to disclose the weak financial condition of the Hercules business at the time of the offering and McDonald's promises to Hercules' clients to repay their losses.

129.   In addition McDonald and Hercules engaged in a scheme to defraud whereby they defrauded Hercules investors by making and/or disseminating false and misleading statements, misused investor funds by using them to pay McDonald's personal expenses, Hercules clients, a Hercules loan, and by transferring investors funds to ISA.

130.   Because McDonald, as the sole owner and control person of ISA and Hercules and the investment adviser to the ISA Fund and the portfolio manager of the Hercules Fund, exercised day-to-day control over these entities, he is the maker of these statements to investors.

131.   By engaging in the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, employed devices, schemes, or artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

132.   Defendants, with scienter, employed devices, schemes, or artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities by the conduct described in detail above.

133.   By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act,15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF

### Fraud by an Investment Adviser

### Violations of Sections 206(1) and 206(2) of the Advisers Act

### (Against All Defendants)

134.    The SEC realleges and incorporates by reference paragraphs 1 through 116 above.

135.    During the Hercules Fraud Period, Defendants were investment advisers within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).

136.    Among other things, Defendants breached their fiduciary duties to their clients by commingling, misusing, and misappropriating the funds those clients invested in the Hercules equity securities.

137.    By engaging in the conduct described above, Defendants, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce, knowingly and/or recklessly: (a) employed or are employing devices, schemes or artifices to defraud clients or prospective clients; and knowingly, recklessly and/or negligently (b) engaged in or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

138.    By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## FOURTH CLAIM FOR RELIEF

### Fraud Involving a Pooled Investment Vehicle

### Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8

### (Against Defendant McDonald)

139.    The SEC re-alleges and incorporates by reference paragraphs 1 through 116 above.

140.   McDonald defrauded ISA Fund investors by (1) falsely claiming that the ISA Fund would use investor funds to profitably trade securities, (2) sending investors false account statements that McDonald created which showing positive account balances and investment returns, (3) claiming investor funds would be held in cash at month's end, (4) using false and misleading brochures and contracts indicating that ISA was properly registered as an investment adviser, and (5) misusing and misappropriating investor funds by using them to pay his personal expenses, to pay Hercules clients and/or creditors, and to pay Ponzi-like returns to investors.

141.   By engaging in the conduct described above, McDonald, directly or indirectly, by engaging in the conduct described above, while acting as an investment adviser to a pooled investment vehicle, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce, knowingly, recklessly and/or negligently:  (a) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which there were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or (b) engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

142.   By engaging in the conduct described above, McDonald violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4) and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

## **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Section 206(1) and Section 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining McDonald and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4) and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

## IV.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7), 15 U.S.C. §§ 78u(d)(5) & 78u(d)(7).

## V.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of

all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  September 21, 2022                    */s/ Charles E. Canter*

Charles E. Canter
Attorney for Plaintiff
Securities and Exchange Commission